THE MAYOR AND ALDERMEN OF THE CITY OF MOBILE, PLAIN-
TIFFS IN ERROR, *v.* MIGUEL D. ESLAVA, DEFENDANT IN ERROR.

A lot of ground, part of the ground on which Fort Charlotte had been erected, in the
city of Mobile, before the territory was acquired from Spain by the United States, had
been sold under an act of Congress of 1818. The lot had been laid out according
to a plan by which a street called Water street was run along the margin of Mobile
river; and the street was extended over part of the site of Fort Charlotte. The lot
was situated west of Water street, but when sold by the United States, its eastern
line was below high-water mark of the river. The purchaser of this lot improved
the lot lying in front of it, east of Water street, having filled it up, at a heavy ex-
pense, thus reclaiming it from the river, which at high-water had covered it. When
the lot east of Water street was purchased, the purchaser could not pass along the
street, except with the aid of logs, and other timber. Water street was, in 1823,
filled up, at the cost of the city of Mobile. Taxes and assessments for making side-
walks along Water street, were paid to the city of Mobile by the owner of the lot. The
city of Mobile had brought suit for taxes, and had advertised the lot for sale, as the pro-
perty of a tenant under the purchaser of the lot. On the 26th of May, 1824, Con-
gress passed an act, which declared, in the first section, that all the right and claim
of the United States to the lots known as the Hospital and Bakehouse lots, contain-
ing about three-fourths of an acre of land in the state of Alabama; and all the right
and claim of the United States to all the lots not sold or confirmed to individuals,
either by this or any former act, and to which no equitable title exists, in favour of
any individual under this or any other act, between high-water mark and the channel
of the river, and between Church street and North Boundary street, in front of the
city of Mobile, should be vested in the corporation of the city of Mobile for the use
of the city forever. The second section provides, "that all the right and claim of
the United States to so many of the lots east of water street, and between Church
street and North Boundary street, now known as water lots, as are situated between
the channel of the river and the front of the lots, known under the Spanish govern-
ment as water lots, in the said city of Mobile, whereon improvements have been
made, be and the same are hereby vested in the several proprietors and occupants of
each of the lots heretofore fronting on the river Mobile," &c. The city of Mobile
claimed from the defendant in error the lot held by him, under the purchase from the
United States, and the improvements before described; asserting that the same was
vested in the city by the first section of the act of 1824. Held, that under the pro-
visions of the second section of the act, the defendant in error claiming under the
purchase made under the act of 1818, and under the act of 1824, was entitled to
the lot.

The right relinquished by the United States was to the water lots, "lying east of
Water street, and between Church street and North Boundary street, now known as
water lots, as are situated between the channel of the river and the front of the lots,
known under the Spanish government as water lots, in the said city of Mobile,
whereon improvements have been made." The improvements refer to the water and

not to the front lots. A reasonable construction of the act, requires the improvements to have been made or owned by the proprietor of the front lot, at the time of the passage of the act. Being proprietor of the front lot, and having improved the water lot opposite and east of Water street, constitute the conditions on which the right under the statute vests.

IN error to the Supreme Court of Alabama.

The plaintiffs in error instituted an action, called in the language of the laws of Alabama "a plea of trespass to try titles," against Miguel D. Eslava, the purpose of which was the recovery of possession and damages for the detention of a certain lot of ground, in the city of Mobile, bounded north by ground in the possession of Thomas Terry, east by Commerce street, south by Church street, west by Water street; and extending from the east side of Commerce street to the channel of the river.

The cause was tried in the Circuit Court, in November, 1837, and a judgment on the verdict of a jury was rendered for the defendant. The plaintiffs took a bill of exceptions to the charge of the Court, and afterwards prosecuted a writ of error to the Supreme Court of Alabama; where the judgment of the Circuit Court was affirmed. The plaintiffs took out this writ of error to the Supreme Court of the United States.

The bill of exceptions stated that the lot in controversy was held by the defendant, under the following circumstances: By an act of Congress, passed in 1818, the lot of ground whereon Fort Charlotte, in the town of Mobile, had been situated, was directed to be surveyed and laid off into lots, with suitable streets and avenues, conforming as near as may be to the original plan of the town; and the lots thus laid off, were directed to be sold under the authority of the President of the United States. The lots were surveyed and laid off, and were afterwards sold. By an original plan of the town, a street known as Water street was run on the margin of Mobile river, continuous with and fronting the same. This street was run on part of the site of Fort Charlotte, where the lots are laid out—another street known as Church street was laid off on the site of the fort. The lots were sold by the United States, agreeably to the plan; no lots were laid off, and none were sold by the United States, east of Water street. Under the Spanish government, and while the United States held possession of Fort Charlotte, there was an open unobstructed

space from high-water mark on the river to the channel, except a wharf used for the commerce of the fort.

The lot in dispute is situated on the east side of Water street, directly opposite to the lot sold by the United States part of the site of the fort, within the open space between high and low-water mark, and part of it within the boundary of the picket fence that formerly surrounded the Fort. After the purchase of the lots laid out on the site of Fort Charlotte, by "The Lot Company," a survey was made by the company, and a larger quantity of ground was included in the survey. The defendant holds under a purchase from the lot company. There is a regular oceanic tide in the river Mobile, the ebb and flow of which is about eighteen inches. In 1822, Water street and the lot in dispute were between high and low water mark. The city of Mobile, at the cost of the city, filled up Water street to some extent, and confined the water at high-tide to the eastern edge of Water street. No evidence was offered to prove the lots in front of Fort Charlotte were known under the Spanish government as water lots, on which improvements had been made.

The plaintiffs, in the Circuit Court, claimed title under the act of Congress of 20th May, 1824, entitled "An act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals in the said city." Considerable sums of money were expended by the purchasers of the lots on the site of Fort Charlotte, to fill up the lots between Water street and low-water mark; and the passage along Water street could only be made, until it was filled up by the corporation of Mobile, by logs laid along the street. The lot in dispute had been filled up at a heavy expense, and the tenant of the defendant in error had, according to an entry on the books of the corporation in 1823, filled up a stagnant pond at the end of Church street, which had been occasioned by the improvement on the lot. One witness testified, that the stakes in front of the lot, when sold by the United States, ran to the east of Water street, so that a portion of the property, when purchased from the United States, would have been within the staked lines of the lot. Evidence was offered by the defendant to prove that in 1828, and for every year until 1836, taxes on the lot had been paid to the corporation of Mobile; that in 1833, the person in possession of the lot had been required

by the mayor of Mobile, to fill up two places upon it with earth or shells; and about the same time, the corporation had advertised the lot for sale, for unpaid taxes, which were afterwards paid.

The act of 20th May, 1824, by its first section, declares, "that the right and claim of the United States to the lots known as the Hospital and Bakehouse lots, containing about three-fourths of an acre of land in the state of Alabama; and also all the right and claim of the United States, to all the lots not sold or confirmed to individuals, either by this or any former act, and to which no equitable title exists in favour of any individual, either by this or any former act, between high-water mark and the channel of the river, and between Church street, and North Boundary street, in front of the said city, be, and the same are hereby vested in the mayor and aldermen of the said city," &c.

The second section of the act declares, "that all the right and claim of the United States to so many of the lots east of Water street, and between Church street, and North Boundary street, and now known as water lots, as are situated between the channel of the river, and the front of the lots known under the Spanish government as water lots, in the said city of Mobile, whereon improvements have been made, be and the same are hereby vested in the several proprietors or occupants of each of the lots heretofore fronting on the river Mobile, except in cases where such proprietor or occupant has alienated his right to any such lot now designated as a water lot," &c.

Upon which the judge charged the jury, that if the lots specified in the patents 10, 11, 12, &c., were proved to have been bounded by high-water mark at the time purchased, then they came within the terms of "lots known under the Spanish government as water lots, as used in the act of Congress;" and if proved that the lot claimed was east of Water street, and in front of the lots covered by the patents, and that had been improved before the passage of the act; it was vested in the proprietors and occupants of the lots held under the patents: and this although Water street did intervene between the lots claimed and those held under the patents.

The case was argued by Mr. Test, for the plaintiffs in error, and by Mr. Johnson, and Mr. Sergeant, for the defendant.

The decision of the Court was given upon the construction of the act of Congress of 1824, entirely. The arguments of the counsel, on all the other questions which were discussed, are therefore necessarily omitted.

Mr. Test said the act of Congress of 1824, is the foundation of the title set up by the plaintiffs; and if they are not entitled to hold or recover under that act, they have no title whatever.

The act was a pure commercial regulation, having in view the promotion of the commercial branch of the national industry. It is a part of the history of the country, that Mobile was once one of the most sickly places on the globe. It was surrounded by islands and marshes, and the banks of the river were flat and swampy; and from this cause it was frequently visited by the most fatal diseases. Thus it remained for years after the country was acquired by the United States.

One of the regulations of the Spanish government, was that the lands granted to individuals never extended into the river, or even to it; but the grantee was bound to leave a bank or ridgeway along the river margin. Wharfs, or landing-places were always established by public authority; and the ground, part of which is now in dispute, had remained unimproved until the act of 1824 was passed.

The growing population of the city of Mobile, and the fact that it was the outlet of the great and increasing productions of the state of Alabama, made it an object of particular interest with the government of the United States. As no grants of land had been made beyond high-water mark, and the improvement of the low grounds between high and low water mark was essential to the health of the city, Congress passed the act of 1824, giving to the owners of lots running to the river, the ground in front of the same, on which improvements had been made. The lots between Church street, and North Boundary street, intended as the most northern street of the city, were those comprehended in the provisions of the act of Congress.

It was clearly intended by the act of Congress to give to the city, for the purpose of improving and erecting wharves and landing places, all the land on the shores of the river, from Church street to the northern boundary of the city; and not to confine the city

to the width or location of Water street, nor to that part of the city where streets had been laid out; for that would not have provided a remedy commensurate with the evil. To the city was given by the act all the land below high-water mark on which no improvements had been made, so that not a remnant should be left from one end of the city to the other.

The lot in controversy in this case lies, without doubt, in the part of the city to which by any construction of the terms of the statutes describing the property granted, applies. In other cases, it may be necessary to ascertain which was meant by North Boundary street; but it is not in this.

Thus the title of the plaintiffs in error is clearly made out, unless the defendant has a better title, under the second section of the act of 1824, or by the act of 1818, under which the lots laid out on the site of Fort Charlotte were sold. One of the counsel for the defendant has maintained, that the defendant was the riparian owner of this lot. This question need not now be discussed, as the title under the act of 1824 is alone under examination.

The defendants counsel also say that having purchased the lot under the act of 1818, which extended to the river; and having improved the lot to low-water mark, the provisions of the second section of the act apply to and give title to the property. This is denied. It was expressly proved, that the lots on which Fort Charlotte stood were not known as water lots under the Spanish government, on which improvements had been made. Fort Charlotte, and the ground appurtenant to it, under the Spanish government, were bounded by the margin of the river.

The object of Congress was to give to the owners of lots in the old town of Mobile, who had improved them, the gr und to low-water mark for river purposes, and to promote the health of the city; but it was not intended to extend the grant beyond those lots held under Spanish concessions, else why confine the grant to the owners of lots known under the Spanish government as water lots, whereon improvements had been made? If the lots laid out on the site of Fort Charlotte, and which had been sold, were intended to be included in the donation, why did not Congress so declare in apt words to express that purpose?

Mr. Test also contended, that by a reference to a map ex-

hibited, some of the lots laid out on Fort Charlotte were clearly shown to be out of the lines of the ground included in the act of 1824 ; and he said none of the Fort Charlotte lots could be considered within the letter or spirit of the act, as all had the same claims. To apply them to this lot, and not to all, was inconsistent.

Mr. Sergeant, for the defendant, upon the title claimed under the act of Congress of 1824, contended, that the act 1824 granted the lot in controversy to those under whom defendant claims ; and not to the city of Alabama.

The plaintiffs claimed, he remarked, entirely and exclusively, under the act of 1824, which operated as a gift, without any consideration whatever. They were not purchasers. Neither were they to take for the public, but for themselves, for their own use and benefit. It was incumbent upon them, therefore, to make out their case, clearly, and without reasonable doubt.

The defendants, on the contrary, had an equity before the act, from possession with claim of right, improvement, and, in fact, creation of the property by redeeming it from the water.

In construing this act, the whole of it must be taken together : and, further, any construction should be very cautiously admitted that would overturn a received construction long acted upon.

The act has a twofold operation : it operates by way of grant, and it operates by way of confirmation, or release. For the city of Mobile, it operates by way of grant only, and that grant is entirely gratuitous, being without consideration. First, it gives, specifically, the Bakehouse lot and the Hospital lot, both of them defined public property of Spain, and passed as such to the United States by treaty. They passed from the United States to the city of Mobile, by their appropriate boundaries, as the Fort Charlotte lot passed to the purchasers ; with only this difference, that the latter paid for what they got.

As to all the rest, the grant to the city of Mobile is of what is not otherwise granted, confirmed, released, or excepted. The language of the first section is " not sold or confirmed to individuals either by this or any other act ;" and "to which no equitable title exists in favour of any individual," &c. And then there is the general proviso to the whole act, " That nothing in this act contained shall be construed to affect the claim or claims,

[The City of Mobile v. Eslava.]

if any such there be, of any individual or individuals, or of any body politic or corporate." The city of Mobile, though first in the order of the act, is last in the order of grant. All the other grants, confirmations, releases, exceptions, and provisoes, are to be satisfied; and then the city is to take what "right and claim" there may be of the United States, not asserting that there will be any.

Now, in the first place, the defendant had a right by the sale under the act of 1818, as has already been stated; which is confirmed, if necessary, by the act of 1824.

In the next place, he had an "equitable title," by possession, improvement, expenditure of money and labour in redeeming the land, contributions in taxes, and the like, repeatedly recognised by the United States as the ground of a pre-emption right. He has, especially, an equitable title against the city of Mobile, who not only looked on while he was expending money and labour as owner; but compelled him to pay taxes as owner for the public use, and to contribute to the public gratification and convenience by adorning the streets in the neighbourhood of his property; and finally by resolution, ordered him to be prosecuted as owner for an alleged nuisance on his lot.

Again, he is within the very words of the second section of the act of 1824, and within the decision of this Court, in Pollard's heirs v Kibbé, 14 Peters, 353. In the bill of exceptions (Printed Record, 10) the facts were submitted to the jury by the judge, with instructions precisely conformable to the act. The facts have been found, and upon those facts the judgment is right. With the state of facts, judicially settled, as the record shows, the defendant was clearly entitled under the act; and it would have been palpable error to give judgment against him. There was no "right or claim" remaining in the United States; and therefore there was none granted to the city of Mobile. It is of no importance that other questions arose and were discussed in that Court, or in the Supreme Court of Alabama; nor whether the opinion upon them was right or wrong. If the defendant was entitled to judgment, those questions are immaterial, and this Court will affirm the judgment upon its proper grounds. The defendant has a perfect title under the act of 1824, whether he had a right before or not; and no one can gainsay it, who claims

[The City of Mobile *v.* Eslava.]

by virtue of a residuary grant of the same act, as the city of Mobile does.

It is needless to add, finally, that the defendant clearly had a "claim" within the proviso of the act. He was in actual possession, notoriously claiming a right. The United States never meant to convey to the city of Mobile a capacity to disturb possessions, and carry on lawsuits. Neither did they mean to destroy the power of Congress to hear applications for relief from persons whose claims, though imperfect, were entitled to equitable consideration and allowance. Where the land was vacant, and no claim was made to it, it was granted. Such a grant was consistent with the ordinary method of proceeding. But to part by grant, (and especially without consideration or equivalent,) with the power of doing liberal justice to claimants in actual possession, in the usual way; would seem to be against precedent, policy, and reason, and in derogation of the accustomed privileges of the citizen. This Court has not so interpreted the act of 1824. Pollard's heirs *v.* Kibbé, 14 Peters, 365. The claim was at least such an one as might be presented to Congress; and such an one, therefore, as to be within the proviso, according to the decision of this Court.

Mr. Justice M'LEAN delivered the opinion of the Court.

This case comes before this Court on a writ of error to the Supreme Court of Alabama.

The plaintiffs brought an action to recover certain lots in the city of Mobile, bounded east by Commerce street, south by Church street, on the west by Water street, and extending on the east side of Commerce street to the channel of the river. They claim title under the act of Congress of the 26th May, 1824; and the Circuit Court of the state, in which the action was first brought, decided against their title. That decision was removed to the Supreme Court of the state by writ of error, where the judgment of the Circuit Court was affirmed. Under the twenty-fifth section of the judiciary act of 1789, the case is brought before this Court.

The first section of the above act declares, "That all the right and claim of the United States to the lots known as the Hospital and Bakehouse lots, containing about three-fourths of an acre of

land in the state of Alabama; and also, all the right and claim of the United States to all the lots not sold or confirmed to individuals, either by this or any former act, and to which no equitable title exists in favour of any individual under this or any other act, between high-water mark and the channel of the river, and between Church street and North Boundary street, in front of the said city, be, and the same are hereby vested in the mayor and aldermen of the said city of Mobile, for the time being, and their successors in office, for the sole use and benefit of the said city forever."

The defendant's title was acquired by purchase from the United States, at a public sale, in 1820. This sale was made under the act of Congress of the 20th April, 1818, which gave power to the President to sell the ground on which Fort Charlotte, at Mobile, stood. The ground was required to be laid off into lots, with suitable streets and avenues, conforming, as near as practicable, to the plan of the city. Ten squares and parts of squares were surveyed and divided into lots, streets, &c. By the original plan of the city, a street known as Water street, was run on the margin of the Mobile river, and this street, by the said survey, was extended over a part of the site of Fort Charlotte along the margin of the river. No lots were sold east of this street. Lots 10, 11, 12, and 13, in square 1, lie immediately west of Water street, and are bounded by it. The lots in dispute lie east of Water street, and directly opposite the lots above numbered.

In 1822, Water street and the property now in dispute, were between high and low water mark. The corporation of the city, in 1823, expended four hundred dollars in filling up Water street; and by the improvement confined the water at high tide to the eastern side of Water street.

It was proved on the trial, that in order to reclaim one of the lots in square 2, east of Water street, the owner had to fill up seven feet; and that he could not pass along Water street at that time except with the aid of logs and other timbers. Another witness stated that he purchased the lot west of the lots in dispute, and that he had to fill up his lot before it could be occupied. And other evidence was given by defendant conducing to prove that the eastern line of the lots, at the date of the sale, was

below high-water mark; and that the company who purchased the lots, at the sale of the government, expended about three thousand dollars for the common benefit of their property, and to keep the water from it. It was also proved that after the purchase of one of the lots in controversy, by Addin Lewis, under whom the defendant claims, he caused dirt to be hauled upon it, and timbers were laid to force out the water and fit the lot for a timber yard. Charles Matthews, who owned one of the lots, bounded by the water, expended one thousand dollars in filling up his lot.

And to show improvements on the lots in dispute before 1824, the defendant read from the book of the corporation, the following entry, dated in 1823: "Charles S. Matthews having improved his lot by filling it up, and a stagnant pond being occasioned thereby at the end of Church street, &c." In 1824, about one-half of the space between Water street and Commerce street, was subject to be covered by water at the ordinary tides. Water street was not opened as low as Church street until 1824. It appeared that the defendant and those under whom he claims, had paid taxes on the property to the corporation. That in 1824 or 1825, the defendant was required to pay for side walks around his lots, upon the assessment of the corporation; and in 1833, he was required by the mayor of the city, to fill up two places upon one of the lots with earth or shells. About this time, the lot was advertised for sale, as the property of Matthews the defendant's tenant, for taxes due the corporation; which were afterwards paid, with the costs of advertising, &c.

Upon these facts, the Circuit Judge charged the jury, "That, if the lots specified in the patents 10, 11, 12, &c., were proved to have been bounded by high-water mark at the time purchased, then they came within the terms of 'lots known under the Spanish government as water lots,' as used in the act of Congress; and if proved that the lots claimed were east of Water street, and in front of the lots covered by the patents, and that they had been improved before the passage of the act of 1824, they were vested in the proprietors and occupants of the lots held under the patents; and this, although Water street did intervene between the lots claimed and those held under the patents." And the Court further charged the jury, that "if the proof showed the property

[The City of Mobile v. Eslava.]

to have been assessed in 1823, by the city authorities, at four thousand dollars, and recently at eighty-eight thousand dollars, and that the improved value resulted from the labour of Charles Matthews; that if in August, 1823, the mayor and aldermen, in reference to one of the lots in dispute, had on their minutes used this language, viz.: Whereas Charles Matthews has commenced to improve his lot by filling up, &c., and that a committee was organized to inquire into a nuisance connected with the lot; that in 1824 or 1825 of the years between that and the commencement of the suit, the city taxes had been assessed on the property and collected from Matthews; and that he had been required by an ordinance of the mayor and aldermen to make side walks along this lot, and had so done; that Matthews had by a written notice issued by the mayor, been required to fill up some low places on said lot, to abate a nuisance thereon, and that this property was advertised for sale as the property of Matthews, in one of the city papers, for the non-payment of city taxes assessed thereon; and that subsequently Matthews had paid such taxes into the city treasury: that the f cts estopped the plaintiff from asserting any pre-existing title under the act of Congress."

The plaintiffs' counsel requested the judge to charge the jury, "that if they believed the facts were proved as contended for by them, that the plaintiffs were entitled to a verdict in their favour; which the judge refused to do."

In their opinion, the Supreme Court of Alabama do not give a construction of the act of 1824, under which the plaintiffs' right is asserted; but consider the respective rights and powers of the federal and state governments arising under the federal Constitution, and the compact entered into on the admission of the state of Alabama into the Union. The power of the Spanish monarch over the soil and navigable waters, when the territory was under his dominion, is also considered and illustrated; and the doctrines of the common law as applicable to the subject are examined: and by this course of reasoning, the Court, among other conclusions, decide that the act of 1824 is void, as Congress had no power to grant the property in dispute.

The result of this investigation was the affirmance of the judgment of the Circuit Court. And so far as regards the question before us, it is immaterial by what process of reasoning the

x 2

Supreme Court of Alabama came to this conclusion. Their opinion constitutes no part of the record, and is not properly a part of the case. We must look to the points raised by the exceptions in the Circuit Court, as the only questions for our consideration and decision.

Both parties set up a right under the act of 1824. It is the foundation of the plaintiffs' title ; and the defendant relies upon it as sanctioning his claim. Now, no construction of this act can favour the hostile pretensions of both parties ; and if the true construction of it shall give no title to the plaintiffs, this controversy is at an end. And in this view it is unnecessary to inquire into the constitutionality of the act.

The defendant insists that his right is sanctioned by the second section of the above act, which provides, " that all the right and claim of the United States to so many of the lots of ground east of Water street, and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river and the front of the lots known, under the Spanish government, as water lots, in the said city of Mobile, whereon improvements have been made, be, and the same are hereby, vested in the several proprietors and occupants of each of the lots heretofore fronting on the river Mobile, except in cases where such proprietor or occupant has alienated his right to any such lot now designated as a water lot, &c."

This Court gave some consideration to the construction of this section in the case of Pollard's heirs *v.* Kibbé, 14 Peters, 353 ; and there was a diversity of opinion among the judges on the subject. It must be admitted that the section was loosely drawn, and its meaning may be somewhat involved in doubt.

Some doubt has been expressed whether the improvements required were to have been made on the front or water lot. But we think they must be made on the latter. The right relinquished by the United States was to the water lots lying " east of Water street," " and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river and the front of the lots known under the Spanish government as water lots, in the said city of Mobile, whereon improvements have been made." Now it will be observed that all the words between the words " water lots" first used in the

above sentence, and the words "whereon improvements have been made," are only descriptive of the locality of the water lots to which the right was relinquished. And if this be the case, it follows, that the improvements refer to the water, and not the front lots. And we think a reasonable construction of the act requires the improvements to have been made or owned by the proprietor of the front lot, at the time of its passage. Being proprietor of the front lot, and having improved the water lot opposite and east of Water street, constitute the conditions on which the right, if any, under the statute vests.

In his charge to the jury, the judge laid down these conditions in clear terms; and instructed the jury, if the facts brought the defendant within them, that they should find against the plaintiffs. The jury did so find, and this is conclusive as to the facts of the case: and the only inquiry remains, whether by any possible construction of the act, in view of these facts, any right under it can be asserted by the plaintiffs.

A statute so badly drawn as to vest a right to the same property in hostile claimants, would in itself be a nullity. Exceptionable and involved as the language of this statute may be, it is not obnoxious to this objection.

The first section, under which alone can the plaintiffs pretend to have any colour of right, excepts from its provisions "lots sold or confirmed to individuals, either by that or any former act, and to which an equitable title exists in favour of any individual under that or any other act." This exception embraces the right of the defendant, as found by the jury; and shows that however obscure some points of the act may be, its provisions are consistent.

As this is decisive of the case, it is unnecessary to notice the instruction prayed for by the plaintiffs in the Circuit Court; and which the Court refused to give. It was asked in affirmance, generally, of the plaintiffs' right.

The judgment of the Supreme Court of Alabama, which affirms the judgment of the Circuit Court of that state, is affirmed.

Mr. Justice CATRON.

This is a writ of error prosecuted to reverse the decision of the Supreme Court of Alabama, in an action corresponding to an ejectment. The first question is, has this Court jurisdiction

under the twenty-fifth section of the judiciary act? Both parties claim under a private act of Congress of the 26th of May, 1824. It granted to the corporation of Mobile, the lands between high-water mark and the channel of the river, in front of the city: the premises sued for are included within the limits. The decision of the State Court was against the right claimed, on the part of the plaintiffs. First, The defendant set up a claim under the second section of the same act, because he had improved the premises before 1824, and when he was an alienee from the proprietors of the front lots west of Water street.

Second. He insisted that the city was estopped to set up a claim under the act of Congress; because the defendant had improved the lot, and been recognised as owner by the corporation, in various ways.

The plaintiffs having read the act of Congress as a grant, and proved the defendant in possession, asked the Court to instruct the jury, that if they believed the facts were proved, as contended for by them, they were entitled to a verdict; which instruction the Court refused: and a verdict was rendered for the defendant, and judgment given in the Circuit Court for him, to which a writ of error was prosecuted to the Supreme Court. One error assigned is, "That the charge of the Circuit Judge denies that the United States had power to grant the premises in question." On this assignment, there was a joinder—that there was no error.

The plaintiffs' title is set out in the record; and upon this title and upon the last assignment of error, is the opinion of the Supreme Court of Alabama exclusively founded. The opinion is before us, and maintains that the act of 1824 is void; as did a most laboured argument here, on the part of the defendant in error. To meet the opinion, this cause was avowedly brought into this Court, by the corporation of the city of Mobile; it is conclusive in the State Courts against the title of the city, and that of its alienees, to a vast amount of property held under the act of 1824: and I think it is our duty to meet the question; if we do not, the decision will remain the law of Alabama. The whole title of both sides are set forth in the record; and it was quite proper in the Supreme Court of Alabama to commence with the examination of the plaintiffs' first; and if found void, to declare

[The City of Mobile v. Eslava.]

that the plaintiffs could only recover on the strength of their own title, and refuse to examine the adversary title of defendant.

The charge of the Circuit Court on any other point was not noticed; nor do I see how, in another case, the corporation can more prominently present the question on the validity of the act of Congress, so as to bring it before this Court for final decision. First, or last, this is not to be avoided.

That the whole case is before this Court, will be seen by reference to Borland v. Ross, 1 Peters, 664. There both sides derived title under an act of Congress. The defendant's claim was rejected on a construction given to the plaintiff's patent and entry. It recognised the case of Mathews v. Zane, 4 Cranch, 382, as having settled the doctrine that where both sides claim under acts of Congress, and come to this Court under the twenty-fifth section of the judiciary act, for their construction, the Court proceeds on the whole case; and for either side. The Court say— "The third article of the Constitution, when considered in connection with the statute, will give it a more extensive construction than it might otherwise receive. It is supposed that the act (1789, s. 25) intends to give this Court power of rendering uniform the construction of the laws of the United States, and the decision of rights and titles claimed under those laws." This decision was made in 1808.

The case of Borland v. Ross, was this:

Borland claimed by a patent, dated October, 1830, founded on an entry of 1807.

The defendant claimed under a patent dated in 1819.

The State Court adjudged the younger patent the better title; it was coupled with the entry—giving the title date from 1807. This Court say—" By the Constitution, the judicial power shall extend to all cases arising under the Constitution or laws of the United States, and treaties made, or to be made, under their authority: and where the construction of a statute of the United States is drawn in question, and the decision is against the right, or title set up under it, the decision may be re-examined, and reversed or affirmed, by this Court. The Court held, that as both parties claimed under the act of Congress, the case of Mathews v. Zane governs.

The point was more prominently presented in Wilcox *v.* Jackson, 13 Peters, 509.

A pre-emption claimant took old Fort Dearborne, at Chicago. He got a certificate from the register of the land-office; on this he sued in the State Circuit Court in Illinois. A special verdict set out all the facts. The defendant was a military officer in the fort. The United States resisted the claim, because it was insisted the fort was appropriated land. On the special verdict, and on the broad facts referred to the Court by the jury; the Circuit Court gave judgment for the defendant. A writ of error was prosecuted to the Supreme Court of Illinois. That Court gave judgment for the plaintiff. Then the United States, in the name of Wilcox, prosecuted a writ of error to this Court under the twenty-fifth section of the judiciary act.

We examined the cause precisely as the Supreme Court of Illinois had done; that is, on the entire record presented by the special verdict.

On what ground the Court below had founded its judgment, we only knew by its opinion produced to us. We reversed the judgment, and rendered one for the defendant. We declared the entry on which the plaintiff founded his action void, on a construction of the acts of Congress governing the case; following, to some extent, Martin *v.* Hunter, 1 Wheat. 305, 355.

In this case the Supreme Court of Alabama declared the grant of the plaintiff void, because the land, as they supposed, had vested previously in the state. Had the bill of exceptions been turned into a special verdict, and there would not be a shade of difference in the cases. On this point there was no doubt entertained in Pollard's heirs *v.* Kibbé, 14 Peters, 53.

With this explanation we will proceed to the merits; and first inquire, whether the claim of the defendant can be sustained under his title from the purchasers of the Fort Charlotte property. By the act of April, 1818, (Land Laws, 756,) the President was authorized to cause Fort Charlotte to be abandoned, and the land on which it stood to be surveyed and laid off into lots, with suitable streets and avenues, conforming as near as might be to the original plan of the city of Mobile; and on the survey being completed, a plot thereof was to be returned to the Secretary of the Treasury; and another to be fur-

[The City of Mobile *v.* Eslava.]

nished to the officer authorized to dispose of the lots, by the President; the lots were to be advertised and sold as other public lands of the United States, and a patent was to be issued for each lot.

The lots were laid off, as also the streets. Water street was located next the bay, and the lots nearest the water fronted that street on the west; the lots were neither surveyed nor sold east of Water street. High tide flowed up to the street, and in part covered it; but east of it there was a wide flat, covered from a foot to eighteen inches deep, when the tide was in; but when out, free from water to the channel of the Mobile river. This flat was easily reclaimed by embankments, and filling up; and was obviously the ground on which a great part of the city would soon be located. Reclaiming lands from the water through that section of country, is the common practice, and was deemed a matter of course in this instance. The purchasers of the Fort Charlotte lots west of Water street, foreseeing the value of the property east of it, seized on the flooded lands on the assumption that they were entitled to go to the channel of the river, as riparian owners of the front on the shore; and on this assumption, sold to Matthews the property in dispute, lying east of Water street. The flat has since been filled up, and there are several streets east of Water street. It is manifest the United States only sold the lots laid off, (for each of which a patent was issued;) reserving the land next the channel of the river: in regard to which, the Supreme Court of Alabama say: "the defendant does not rely upon his riparian proprietorship, as entitling him to the land east of Water street; nor, indeed, could he insist on it with success, as the Fort Charlotte lots were not bounded by the river, but had other fixed metes and bounds." Nor was it possible that the lands seized upon and sold to Matthews, could follow as an incident to the patent, for two additional reasons: First, had the purchase been to the river, or bay of Mobile, in terms, the boundary would have been limited to high-water mark. Such is the rule, (as I think,) beyond controversy, in regard to all our territory acquired from Spain. So the Supreme Court of Alabama held in Hagner *v.* Campbell, 8 Porter's Rep. 24. So it has held in other cases. It is the established law of property in that state. Second, Water street was reserved next the bay, and, being public property, all the inci-

dents of accretion; (had any accrued,) would have belonged to the public, and not to the owners of lots west of the intervening street. On this point the great Battuer case, at New Orleans, turned. See Dubigney's Expose, 22, 58, 59. Gravier claimed to have purchased to the river Mississippi, and the claim was resisted, on the ground that he had only purchased to the highway lying on the bank of the river. The question was, who should have the accretions? The case was decided on the fact that Gravier's purchase of the Jesuit's property was bounded by the bank; and that the road run over his property, as an easement. 2 Hall's Law Journal, 295; 5 Hall's Law Journal, 1 and 113; Angel on Tide-waters, app. 197, Mr. Livingston's argument. The fact that Water street was reserved to the United States is undisputed in this case, and is conclusive of any claim east of the intervening street, in the purchasers of the Fort Charlotte lots. The defendant's title can therefore derive no aid from this source.

2. Did he derive title by force of the act of 1824? The Court below held that the act was inoperative, for want of power in Congress to pass title to the lands between Water street and the channel of the river; and the corporation of the city of Mobile, being the plaintiff, could not recover (as actor) for want of title. That the United States acquired the title to lands flowed by tides, by the treaty with Spain, is, of course, admitted. That they had power to grant, up to the adoption of the Constitution of Alabama, in 1819, is also admitted in the opinion under review. That the Spanish king could grant lands under tide-water, is free from doubt, and the United States acquired by cession all his powers over the vacant soil. But the lands flowed by the tides are claimed for the state of Alabama as a part of her sovereign rights.

To comprehend the nature of the claim some laws and facts must be stated. When the Alabama territory, in 1819, proposed to form a state government, Congress passed an act (ch. 171) to authorize the formation of a state constitution; and proposed several conditions for the adoption of the convention, which were adopted as part of the constitution; and amongst others, it was agreed with the United States, "That the people of Alabama forever disclaim all right and title to the waste or unappropriated lands lying within the state; and that the same shall remain at the sole disposition of the United States."

[The City of Mobile v. Eslava.]

" 2. That all the navigable waters within the state shall forever remain public highways, and free to the citizens of that state, and the United States, without any tax, duty, or impost, or toll therefor, imposed by that state."

The constitution of Alabama was presented to Congress for recognition; and on the 14th of December, 1819, it was resolved, " That the state of Alabama shall be one, and is hereby declared to be one of the United States of America, and admitted into the Union on an equal footing with the original states, in all respects whatever." By the acceptance of the conditions on part of the United States, it is considered clear, says the Supreme Court of Alabama, " That the navigable waters of this state have been dedicated to the common use of the people of the United States; but perhaps it may be considered as questionable what extent of soil is embraced by the dedication. We think it must be so much ground as is covered with water, not only at low but at high tide."

The Court then proceeds further to declare, " That the act of 1824 vested no title in the corporation of Mobile; for the reason that the state of Alabama was admitted into the Union on the footing of the original states. That the original states by their colonial charters had the right of property, in bays and arms of the sea; this they retained, and it can only be interfered with by the federal government, under the right to regulate commerce, so far as to preserve a free navigation. The United States then may be said to claim for the public an easement for the transportation of merchandise, &c., in the navigable waters of the original states; while the right of property remains in the states."

" The original states possessing this interest in the waters within their jurisdictional limits, the new states cannot stand upon an equal footing with them as members of the Union, if the United States still retain over their navigable waters any other right than is necessary to the exercise of its constitutional powers. To recapitulate, we are of opinion: First, That the navigable waters within this state have been dedicated to the use of the citizens of the United States, so that it is not competent for Congress to grant a right of property in the same. Second, The navigable waters extend not only to low water, but embrace all the soil that is within the limits of high-water mark. Third, By the acts of Congress

Vol. XVI.—Y

regulating the survey and disposal of the public lands, the federal government has renounced the title to the navigable waters and the soil covered by them; consequently the plaintiffs cannot recover on the ground of a dedication to the uses of the city under the act of 1824, which is an enactment of a later date. Fourth, The original states, in virtue of their royal charters, are entitled to the right of property in the navigable waters within their territory, while the public are only entitled to an easement, to be provided for under that provision of the federal Constitution which authorizes Congress to regulate commerce, &c. Alabama is admitted into the Union on an equal footing with the original states; and, of consequence, is entitled to the right of property in the tide-waters within its limits. Fifth, By the admission of Alabama into the Union, without a reservation of the right of property in the navigable waters, the state succeeded to all the right of the United States, except so far as it was reserved by the federal Constitution in some of its grants, or its retention was necessary to enable the federal government to exercise its delegated powers. Having attained these conclusions, it will follow that the act of 1824 is inoperative, and confers no title upon the plaintiffs."

That the original states acquired by the Revolution the entire rights of soil, and of sovereignty is most certain. And if it be true that Alabama was admitted on an equal footing in regard to the rights of soil with the original states, she can hold the high lands equally with the land covered by navigable waters; and so can nine other states equally hold, to the utter destruction of all claim to the lands heretofore indisputably recognised as belonging to the United States, as being a common fund of the Union.

The clause inserted into the constitution of Alabama, reserving the rights of property to the United States, as a compact with them, embraces lands under water as emphatically as those not covered with water? But if no stipulation saving the interest of the United States had been made, they would have had just as much right to their private property as an individual had to his. They hold, as a corporation, an individual title.

The Constitution of the United States provides, " that the Congress shall have power to dispose of, and make all needful rules and regulations respecting the territory or other property belong-

ing to the United States: and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state." This is the paramount law of the land, by force of which the public domain in Alabama was held and governed, and which needed no aid.

Neither did Congress cede it by stipulating that the navigable rivers should be highways. That such waters are common for the purposes of navigation and commerce, in the widest sense, is free from doubt; that Alabama has jurisdiction and power over them, the same as the original states have over their navigable waters, is equally clear. Yet it does not follow that the fee of the shores, banks, and soils under water, is in the state of Alabama. The United States, as owner, can do no act to obstruct the free public use of the waters, more than a private owner of the soil under water could obstruct the navigation. The individual owner in fee of the bottom of a navigable river, can cultivate and take out the shell fish or the minerals from the bed; nor can it be doubted that the United States may pursue veins of silver, tin, lead, or copper, under the bottom of a bay, the river Mississippi, or a great lake; although they could not impede in any degree their navigation. So may the assignees or lessees of the United States do the same. Nor can it be otherwise in regard to the occupation of the lands between high and low water mark. The Delta of Mississippi, the greater part of East Florida, much of Alabama, and also of the state of Mississippi, have lands covered slightly with the flow of high-water. These lands are subject to be redeemed by embankments; they amount to some millions of acres; many of them are of the best rice, indigo, and even sugar and cotton lands on this continent. Immense bodies of land are flowed by the great lakes, and subject to be redeemed; and, yet more, many parts of the shores of the great river Mississippi, from the mouth of the Missouri to the ocean, are annually flowed by a tide of its own; and the lands are redeemed by levees from the water until the vessels on the surface of the river float above redeemed plantations that have been submerged for months every year; and that were submerged in 1819, when it is supposed the United States, by implication, ceded all the flowed lands within her limits to Alabama. Embankments to exclude the water are almost as common on the banks

of the Mississippi river, and in the Delta of country embraced by its mouths, as are fences in other parts of the country to protect the crops from animals; and it is not in the reach of probability, or of belief, that Congress, by an oversight, surrendered all flowed lands to the states in which they lie; or that it was intended to cede to the new states the right to prohibit the construction of forts and defences by the United States, on the public lands below the high-water mark. I imagine it has never occurred to any one, that a purchase of the soil from the state of Louisiana was necessary before works within the flow of tide-water could be constructed for the defence of the mouths of the Mississippi river. The idea is new; and the assumption leading to such a consequence, startling. It is certainly not so in Alabama. To cut off every pretence of the kind, Congress asked Alabama when she entered the Union, to disclaim all right and title to the unappropriated and waste lands lying within the state, and that the same should remain at the sole disposition of the United States; and to this Alabama bound herself in the most solemn manner by her constitution. The claim set up for her, on this ground, has therefore no just foundation.

The Supreme Court of Alabama also holds that by the several acts of Congress, regulating the survey of the public lands, it is provided that those which border on navigable waters shall not include within their lines any part of the shore: and, therefore, the federal government has renounced the title to the navigable waters, and the soil covered by them.

The United States have surveyed the shores of the tide-waters, great lakes, and certainly the banks of the great rivers to a wide extent. From the first, shores and banks of rivers have been the boundaries of fractional sections; large quantities of land have been sold and are now in the market, within the high-water mark; many even on the Alabama river. On the Mississippi, most of the fractions are partially overflowed. Towns and villages on the banks of the river are partly within the high-water mark, resting on patents from the United States; or on confirmed French and Spanish claims. Scarcely any are exempt from this supposed infirmity of title when situated on tide-water or on the larger rivers, and this is especially so in regard to the towns on the Mississippi, within the range of country sold out by the

United States. Indeed, one town, at the mouth of the Ohio, is entirely below high-water mark, and secured by embankment; so that it is idle to adduce the practice of the government as proof of abandonment. The United States reserved the lands under water, and between high and low water mark, in many instances for public use; and subject to grant by special acts of Congress. That this is so, we need go no further than the city of Mobile for evidence. The British government made a grant to William Richardson, in 1767, fronting on Mobile river one hundred and forty poles, but bounded by the river. In 1807, the Spanish governor at Pensacola confirmed the same to John Forbes and Company, extending to the channel of the river. This grant was void for want of authority in the governor, to make it; the country having been ceded to the United States. Garcia v. Lee, 12 Peters, 511. The act of 1819, (Land Laws, 748,) granted it by confirmation to John Forbes and Company. It lies at the city, is two hundred and sixty-three acres on the high land, and was adjudged a good title in Hagan and Others v. Campbell, by the Supreme Court of Alabama. 8 Peters, 1 to 25. So in Pollards v. Kibbé, 14 Peters, 355. The cause came to this Court from the Supreme Court of Alabama. That Court held that the act of 1824, above referred to, conferred the better title on the defendant. This Court reversed the decision, because the land in dispute was excepted from the act; and declared that the private act of July, 1836, vested the title in fee in Pollard's heirs, the plaintiffs in the suit. They are now in as grantees, by force of the private act, under the sanction of our decision. The land lies east of Water street, and was covered with water at high tide; the same as the land in controversy.

If Congress had no power to grant; the act of 1836 is void and our decision wrong, as was that of the Supreme Court of Alabama in the same case; for they held the previous act of 1824 was a valid grant. Many of the flowed lands must have private owners. The old states are in the constant habit of granting them; in some they are supposed to be of almost equal value with all the high lands: so it was confidently asserted in the argument of the cause of Martin v. Waddell, in regard to New Jersey. The great oyster banks are certainly worth many millions of dollars in that state, and are fast becoming private property. If the

United States cannot make titles, the new states must make them. The city of Mobile, on the river front two squares deep, is without title if it be true that the act of 1824 is void for want of power in the United States to give title. I think it clear that the assumption of abandonment, because of the mode of surveying the public lands, cannot be maintained.

Nor has Alabama a better founded or more plausible claim to the lands between high and low water mark, on the ground that she was admitted into the Union on an equal footing with the original states. What was the condition of these states—the old thirteen—when they entered the Union? In Massachusetts—including what is now Maine—all the right of soil to lands, so far as the sea ebbed and flowed, by the colonial charter, (to the extent of one hundred rods,) was in the owners of the shores; and although the charter was annulled, the right was maintained as the common law of the state at the Revolution. The law and decision are found in Angel on Tide-water, 108; and in Dane's Abr. 694, 698.

So in New York, lands were held under tide-water, especially about the city, by individual titles. Mayor, &c., v. Scott, 1 Caines' Rep. 543.

So it was in west New Jersey—and to a great extent in Pennsylvania and Maryland. The authorities will be found in Martin v. Waddell, decided at this term. It was only in those states where the royal charters had been surrendered or forfeited to the crown, and in which no grants to flowed lands had been made, (if any such there were,) that they devolved on the state as a consequence of the Revolution. That mud-flats were then held in private property in every state of the Union can hardly be doubted. If one was in this condition, it is enough for our purpose. In Massachusetts they were all thus held. If Alabama came in " on the same footing" with Massachusetts; then all the mud-flats may be held in private property also in Alabama.

The stipulation in the ordinance of 1787, and which is repeated in the resolution admitting Alabama, guarantying to the new state equal rights with the old, referred to the political rights and sovereign capacities left to the old states, unimpared by the Constitution of the United States; and which were confirmed to them by that instrument. Whilst territories, the people inhabiting the

countries now composing the new states, were subject to the will
of Congress; unrestrained further than restrictions were imposed
by the federal Constitution; and by compact, where the lands
had been ceded by an original state, or by treaty, when acquired
from a foreign nation. The power of Congress was, and now is,
in the territories, almost absolute. From this power, the terri-
tory is withdrawn, to the same extent, on entering the Union, that
the original states were exempt, when they formed the Constitu-
tion: having equal capacities of self-government with the old
states, and equal benefits under the Constitution of the United
States. This is the extent of the guarantee. That each and all
of the states have sovereign power over their navigable waters
above and below the tide, no one doubts. And it is just as free
from doubt, that the shores and banks of such waters, and the
mud-flats flowed by them, are the subject of private ownership.
The property cannot be appropriated to the obstruction or injury,
of the public use in the water, further than the state government
permits; and if it is attempted, the obstruction may be abated as
a nuisance. Whether the Bay of Mobile has been obstructed, is
not a matter of inquiry; no one pretends that it has been: the
question is, could the flat between high-water mark and the
channel of the river be granted by the individual owner, the
United States. That it could, is, I think, free from doubt; and
that the act of 1824 is valid, and passed the title to the corporation
of Mobile, unless the defendant's premises were excepted from
the grant by the act.

The first section vests in the mayor and aldermen all the lands
between high-water mark and the channel of the river, in front
of the city, that lie below North Boundary street and above
Church street. From which general grant are excepted by the
second section lots on which improvements had been made lying
east of Water street and fronting the water lots, during the Spa-
nish government, lying west of Water street. The improved
property was by the act vested in the proprietor or occupant
of the lot fronting and opposite on the west of the street; or in
the purchaser of the new lot from the owner of the old one.

That the improvement must have been on the eastern and new
water lot, is, to my mind, plain from the reading of the act; so it
has been held by the Courts of Alabama, as appears by the case

of Pollard's heirs: that this has been the construction of the act by the parties interested, is manifest from all the controversies in regard to this property; and those at whose instance the act was passed are the best judges of its meaning. 12 Wheat. 200. The old lots were only referred to, to give locality to the new in case of existing improvements east of Water street. If the proprietor (which means owner) of the old lot had improved on the flat in front of it, then he was entitled by the act to an equal width extending to the channel of the river, as compensation for his improvement. The Fort Charlotte lots were sold to a company, and they improved, before 1824, in front of six of them; and sold to Charles L. Matthews, who continued improving in 1823, and 1824; and has occupied the premises since; and he and his tenants defend the suit. The property was valued, for the purpose of taxation, at eighty-eight thousand dollars at the time of the trial; it was worth only four thousand dollars in 1823, and it was proved the increased value resulted from the labour of Charles Matthews.

The Circuit Court charged the jury (amongst other charges) "that, if the lot specified in the patents 10, 11, 12, &c., were proved to have been bounded by high-water mark at the time of the purchase; then they came within the terms of lots known under the Spanish government as water lots, as used in the act of Congress;" and if it was proved that the lot claimed was east of Water street, and in front of the lots covered by the patents, and that had been improved before the passage of the act, it was vested in the proprietors and occupants of the lots held under the patents; and this, although Water street did intervene between the lots claimed and those held under the patents. The charge is deemed correct. The objection that the lands in front of the Fort Charlotte lots did not pass by the act of 1824, has nothing in it. The first and second sections, refer to the same premises; the first covers all the lands between high-water mark and the channel of the river, and lying between Church street to North Boundary streets: of this there can be no doubt; and the exceptions in the second section apply to every part of the grant, made by the first. On these grounds the judgment should be affirmed.