*590
 
 Mr. Justice CATRON
 

 delivered the opinion of the court.
 

 This case comes here by writ of error to the Supreme Court of Alabama, under the twenty-fifth section of - the Judiciary Act of 1789, and the first question made by the defendants in error is, whether any matter presented by the record will authorize .this court to exercise jurisdiction under the twenty-fifth section. And to ascertain how far, if at all, the powers of this court can be called into exercise, the facts and the laws bearing on them must be stated in -something of detail ; as in this case, in common with many others, it is found much more difficult to settle the question of jurisdiction,' and how . far it extends, than it would have been to decide the merits of the controversy had the cause been brought here by writ of error, to a court of the .United States.
 

 Hunt, Hagan, and others, sued in ejectment Kennedy’s- executors and ..other tenants in possession, for about ten acres of land lying in the city-nf Mobile, in the State Circuit Court. The plaintiffs claimed title to the premises sued for under a grant made to John Forbes & Co. in 1807, by Morales, Intend-ant-General under the Spanish government in the province of West Florida, Spain being then in possession of the province and exercising jurisdiction. The grant, by its recitals, purports to be, in part, the confirmation- of a concession, and' survey founded on it, of earlier dates; say 1796 and 1802, in favor of Panton, Leslie, &• Co., to which firm Forbes & Co. were successors. • The' concession' was surveyed in 1802 by Collins, an authorized surveyor under the Spanish government, and its eastern boundary terminated on the bank of the Mobile River, at high-water-mark ; the survey contained two hundred and sixty-three acres, equal to about three hundred arpens. To the extent óf Collins’s survey there is no controversy, but Forbes & Co. solicited the Intendant-General in 1807 to grant them the flowed land lying east of the eastern boundary of the survey, and between the same and the channel of the river, and which the Intendant proceeded to do, in the following terms :.— “ And as the distance that is observed in the map from the river-to the boundary-lines of the land, which was left vacant at that time in consequence of its having been impassable, has since become of great use to the claimants, having constructed levels and the necessary drains, in consideration of which it has been granted to them as a compensation for their labor thereon invested, with- the. reserve such as necessary to allow a free passage along the bank, of t.he river, without altering the figure of the tract on either of the other sides. Wherefore, using and exercising the'powers which the king our lord — God preserve him! — has conferred on me, I do
 
 *591
 
 in his royal name confirm and ratify to the aforesaid John Forbes & Co. the possession of the three hundred, and ten ar-pens, seventy-seven perches and one eighth, already mentioned, and! which .< e contained in the map (No. 1809), with the corrections made by the surveyor-general, in order that they'may own and riossess the same, sell and alienate the land at their own and entire pleasure, without prejudice to any third person who may have a better right, on condition that they should observe and fulfil the requisitions of the land regulations formed and published by the intendancy on the seventeenth of July, 1799, as far as the local situation and quality of the land will permit.”-
 

 According to Spanish usages and regulations, the grant to Forbes & Co. was a perfect title,'bad as such binding'on the government of Spain, although made in 1807, after that government had parted with its power to grant, according to our construction of the treaty of 1803, the limits of which were claimed by this government to extend east to the River Perdi-do, and which claim has .been upheld and established by- the political and judicial departments of the United’S tates. The first conclusive step was taken by Congress as early as 1804, when, by the act of March '26th of that year, it was declared that all grants-.made by the Spanish .authorities after the 1st day of October, 1800, (the date of the treaty of St. Ildefonso,) should-be held and deemed to be void. But the act excepted from its operation • “ any
 
 bona fide
 
 grant made agreeably to the laws, usages, and customs of the Spanish government, to an actual settler on the lands so granted for himself and for his wife and family ”; and also excepted “ any
 
 boná fide
 
 act or proceeding done by an actual' settler agreeably to the laws, usages, and customs of the-'Spanish government, to obtain a grant for lands actually settled on by the person or persons claiming title thereto, if such settlement, in either case, was actually made prior to the 20th day of December, 1803.” Some restrictions were imposed oh actual settlers in regard to quantity, that have no application to the grant of Forbes & Co; *
 

 The Spanish grant recites that Forbes & Co. had been settled on .the land granted, and that it had. been occupied and cultivated by them since the year 1796, and up to the date of the grant, and such was the proof made before our commissioner, and therefore the
 
 “
 
 proceeding ” by which the imperfect title of Forbes
 
 &,
 
 Co. was completed was within the second exception of the act of 1804. That the grant made by the Intendant-General Morales, in 1807, . was in itself, unaided by the sanction of Congress, a valid title, we do not as
 
 *592
 
 sert; but being reported on by the commissioner as a title complete'.'in form, according to the usages and laws of Spain, and recognized and sanctioned by Congress as a perfect title by the act of 1819, the courts of justice are concluded by the action of the political department, and bound to pronounce the giant to Forbes & Co. a perfect title in substance as Well as form; because the claim was within the exclusive jurisdiction of the political department in 1819, when Congress acted on it. Such is the well-established doctrine of this court, as will be seen by the cases of Chouteau
 
 v.
 
 Eckhart, 2 How. 344; Mackay
 
 v.
 
 Dillon, 4 ib. 421; and especially that of Les Bois
 
 v.
 
 Bramell, 4 ib. 461.
 

 Nor did the grant of Forbes & Co. require any further step to perfect its boundary. This being the
 
 prima, facie
 
 condition of Forbes & Co.’s grant, the next inquiry is whether those claiming under Kennedy’s title were in a condition, on the- trial in the State court, to call the plaintiffs’ title in question.
 

 The defendants below claimed by virtue of an act of Congress,' passed March 2, 1829, confirming an incomplete Spanish concession made to Thomas Price. ByU" ’ h section of the confirming act of 1829, it is pro-.; ' the confirmations of all the claims provided i - act- shall amount only to. a relinquishment for ever, rt of the United States, of any claim whatever to tin of land and town lots so confirmed, and that nothing he ntained shall be construed to affect the claim or claims of any individual or body politic or corporate, if any such there be.”
 

 And by the fifth section of .said act, the register and receiver of the land-office at St. Stephens were invested with power, within their district, to direct’ the manner in which all claims to lands and town lots which had been confirmed by that act should be located and surveyed ; having reference to the laws, usages, and cústoms of the Spanish government on the subject, and also to the mode adopted by the government of the United States, pursuant to the act of March 3, 1803. And by section sixth, certificates of confirmation and-patents were ordered to be granted for all lands and town lots com firmed by the act. - •
 

 According to the act, the claim of Joshua Kennedy (representative of Thomas Price) was duly surveyed on the 2d of February, 1836, and in May, 1837, a patent was taken out by Kennedy for the land described in the survey. The calls in the patent, having any connection with the present controversy, áre as follows: — “ Thence north, 69°
 
 5'
 
 east, 15 chains 44 links, to the ancient margin of the River. Mobile, being
 

 
 *593
 
 34| links west of the south angle of St. Louis and Water Streets; thence north, 66° west, nine chains and seventy-six links, to the,southeast corner of the Orange Grove tract granted to John Forces & Co.” The next line runs north, 82° west, with the southern boundary of Forbes & Co.’s tract.
 

 The southeast corner of the Orange Grove tract is an iron-bound stake, well known, and from which the Spanish survey made by Collins runs due north, and from that line east to- the channel of the river the land was added by the grant of the Intendant-General Morales, in 1807.
 

 The line' of Kennedy’s grant fronting towards the river runs 66° west of north, and it is contended that Kennedy, as a front proprietor, is entitled to claim a' riparian right to the channel of the river, according to lines drawn at right angles to the front line and from each terminus- thereof, unless some other claim shall interfere; and it is insisted that the addition made to Forbes & Co.’s grant in 1807 cannot hinder the assertion of Kennedy’s riparian right, because the addition was made after Spanish authority ceased, and for so much the grant of 1807 is void, and being out of the way, Forbes & Co. can ■only claim as front proprietors, riparian rights in like manner that Kennedy himself claims; and to ext- nd Forbes’s southern line east, and Kennedy’s lines at right angles, as above stated, would produce a conflict of riparian rights incident to the respective grants,, the lines crossing each other at the iron-bound stake, forming an acute angle at the stake, and widening towards the channel of the river; and this angle., it is assumed by those claiming- under Kennedy’s grant, should be divided between the two grants, but in what proportions we are not informed. This assumption- the State- court rejected, and held that Forbes & Co.’s grant took all the land .to the channel of the river north of a direct eKfension of its, southern boundary, and thereby cut off the pretension of Kennedy to the incident of alluvion.
 

 Suppose it to be true that the addition made to'Forbes & Co.’s grant in 1807 was void, for want of authority in the Spanish government, or for any other reason, and that Kennedy’s grant was entitled to divide the alluvion as an incident to it, and that the State court improperly rejected his claim, and wrongfully adjudged the land to Forbes & Co.;, — conceding all these assumptions, can this court' revise and reverse the decision of the State court?-' The controversy respecting the alluvion drew iri question no act of Congress, nor any authority exercised under the Constitution or laws of the-United States, and therefore the decision of the State court could, not be opposed either to the laws, or to any authority exercised under the laws,
 
 *594
 
 of the United States. For the established construction- and application- of the twenty-fifth' section of the Judiciary Act, we refer to the cases of Crowell
 
 v.
 
 Randell, 10 Peters, 391, 398; McKinney
 
 v.
 
 Carroll, 12 Peters, 68; and Armstrong
 
 v.
 
 Treasurer of Athens County, 16 Peters, 284. In this case, as in that of McDonogh
 
 v.
 
 Millaudon, 3 How. 693, the State courts were called dn to construe a perfected Spanish title, and to settle its limits by applying the local law, and having done so,’ this court has- no authority to revise the judgment; nor can we see how the case w;ould have been different had Forbes & Co.’s grant been an elder patent emanating from the United States directly; as in such a case a controversy concerning the incidents of alluvion would not have drawn in question an act of Congress, or a survey made according to an act of Congress.
 

 We deem it useless to examine in detail the instructions proposed by the defendants below, and rejected by the court. 'The only one worthy of notice was that which rejected Weakly’s survey of Forbes & Co.’s grant, made and approved iin 1835. It could not change the grant, nor affect its validity in any degree, and could only be read to establish boundary as a matter of fact; and neither its admission nor rejection, when •offered for such purpose, could give this court jurisdiction, no ■matter which side should be injured; and so this coitrt, in effect, held in the case of Mackay
 
 v.
 
 Dillon, 4 How. 447. The survey was an
 
 ex f arte
 
 proceeding for the purposes of the land-office, and immaterial to Forbes & Co.’s title.
 

 On careful examination, we are of opinion that no one question was raised and decided in the State courts that gives this court jurisdiction to revise such decision ; and that, therefore, •the case must be dismissed for want of jurisdiction.
 

 Order.
 

 This cause came on to be. heard on the transcript of-.the record from the Supreme Court of the State, of Alabama, and was -argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that this cause be and the same is hereby dismissed, for want of jurisdiction.