LEVERICH et al. v. MAYOR, ETC., OF MOBILE et al.

(Circuit Court, S. D. Alabama. November 19, 1867.)[1]

No. 12.

1. NAVIGABLE WATERS—RIGHT OF PUBLIC USE.

It is fundamental law throughout the United States that all navigable waters are common highways, forever free to the use of all citizens of the United States, without any tax, impost, or duty therefor.

2. SAME—TITLE TO SHORE AND SOIL UNDER—RIGHTS OF STATES.

The title to the shore and soil under navigable rivers below ordinary high-water mark is vested in the state within whose territory it lies, where there had been no valid grant of the same prior to its admission into the Union. Such title, however, does not give an absolute ownership, but is held for the conservation and protection of the rights of

---

[1] This case is now published in this series, so as to include therein all circuit and district court cases which have been inadvertently omitted from the Federal Reporter or the Federal Cases.

the public in the use of the waters of the stream, and subject to the rights of riparian owners.

**3. SAME—RIGHTS OF RIPARIAN OWNERS—MAINTENANCE OF WHARVES.**

By long and uniform usage throughout the United States riparian owners on navigable waters have acquired the right to construct wharves reaching from their lands to navigable water. Such right, when exercised for the convenience of commerce, and in such manner as not to obstruct navigation, is in accord with the enlarged public policy of modern times,· and has been recognized by the supreme court of the United States and by many of the states, including Alabama, where it has been recognized both by legislation and judicial decision.

**4. SAME—MOBILE RIVER—POWERS OF CITY OF MOBILE.**

Complainants were the owners of lands lying on the Mobile river, within the limits of the city of Mobile, by titles derived from the United States through acts of congress confirmatory of prior Spanish grants. Such titles had in a number of cases been adjudged valid by the supreme court of the United States and by the supreme court of Alabama, and as extending to the channel of the river. Complainants and their predecessors in title had also constructed and maintained for many years wharves extending to the channel of the river, which had at all times been conveyed and recognized by the courts as private property. By act of January 31, 1867, the legislature of the state granted to the city of Mobile the shore and soil under the river in trust, to direct, control, and manage the same as it should deem best for the public good. *Held*, that complainants were the owners of their wharves, both by virtue of their title to the soil on which they were built, and by their general right as riparian owners to construct and maintain such wharves in accordance with established and recognized usage, and that such act conferred upon the city no right to destroy the value of their property by making such wharves free and prohibiting the charging of wharfage for their use.

**5. INJUNCTION—GROUNDS—THREATENED INJURY TO PROPERTY RIGHTS.**

A court of equity has jurisdiction to grant an·injunction to prevent the threatened invasion by a city of property rights of the owners of wharves within its limits by the adoption of an ordinance prohibiting the charging of wharfage for their use.

**6. SAME—RESTRAINING ACTION BY CITY.**

An ordinance was introduced into a city council by its president. It was drawn and recommended by the city attorney and special counsel appointed for the purpose, and recited that the owners of property on the water front who had constructed wharves had obtained possession of the shore and soil under the river, and held the same without warrant of law, and that the public should be notified that the burdens imposed on commerce by the exaction of wharfage by such owners was unlawful, and enacted that thereafter no wharfage should be charged, except such as might be prescribed by the city, sufficient to keep the wharves in repair. By order of the council the ordinance was published and action thereon postponed until another meeting. *Held*, that such action of the city constituted an interference with the property rights of the owners of wharves, who were legally entitled to maintain the same and to charge for their use, by denying their rights and inciting the public to dispute the same, and threatened further injury, which entitled such owners to maintain a suit for an injunction without waiting for the passage of the ordinance.

In Equity. On motion for preliminary injunction and on final hearing.

George N. Stewart, John A. Campbell, Messrs. Hamilton, and Dargan & Taylor, for complainants.

C. F. Moulton, City Atty., Smith & Herndon, and Boyles & Overall, for defendants.

BUSTEED, District Judge. This cause comes before me upon a motion for a preliminary injunction to restrain the corporation of the city of Mobile from proceeding under an act of the legislature of the state approved the 31st of January, 1867, granting to the corporation of the city of Mobile the shore and soil of the river Mobile within its corporate limits, and appointing the corporation a trustee to administer them for the public good. The corporation were proceeding to declare all the existing wharves in the city to be free, and to discharge all persons from paying any wharfage dues, when this bill was filed. The object of this bill is to restrain the city from the invasion of the right to wharfage, as asserted in the bill. The motion has been debated with a fullness, an amplitude of argument and authority, that has not been exceeded in the conduct of any cause that has been heard before me. The cause is one of great gravity, and it is due to the importance of the questions, and to the magnitude of the public and private interests involved, that the court shall declare the reasons for the order of injunction that has been granted.

One of the marked features in the political institutions of the United States is the freedom of their rivers. This freedom has been declared in great fundamental compacts among the states, and by authority of these is imposed upon the rivers and navigable waters within the boundaries of all of the new states. In the ordinance for the government of the Northwestern Territory passed the 17th of July, 1787, before the adoption of the federal constitution, the first of these acts became the law of the United States. It was then ordained that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same shall be common highways, and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost or duty therefor." In the act passed the 3d of March, 1803, "for regulating the grants of land and providing for the disposal of lands of the United States south of the state of Tennessee," it was provided that "all navigable rivers within the territory of the United States south of the state of Tennessee shall be deemed to be, and remain, public highways"; and in similar acts for the disposal of the public lands in the Louisiana territory and the territory of Florida, as well as those on the Pacific Coast, similar provisions were made; and, to place this dedication beyond the reach of cavil or contest, each one of the new states, including those on the Pacific Coast and the interior of the continent, at the time of its admission to the Union, has been required to adopt a provision similar to that mentioned in the ordinance of 1787, as a fundamental condition upon which their admission to the Union depended. In the ordinance adopted by the state of Alabama at the date of the adoption of the constitution, by which it became a state and was admitted as such into the Union, it disclaimed all title to "the waste or unappropriated lands" lying within the state, and agreed "that all navigable waters within the state shall forever remain public highways, free to the citizens of this state, and of the United States,

without any tax, impost or toll therefor, imposed by the state." A writer of celebrity has said, "Here we behold the Magna Charta of the internal navigation of America which we enjoy, and have first enjoyed of all confederacies, ancient or modern." The questions of the power to regulate these rivers, and in what department of the complicated American system of government the municipal sovereignty over them resides, have been the subject of much judicial discussion, but have been finally settled by authoritative decisions of the supreme court of the United States. Their opinions were all cited and critically analyzed in the argument on this motion. I shall proceed to state my own opinion upon them.

The case of Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997, contains the first answer to the questions by the supreme court of the United States. This case was decided in that court in 1842, in reference to the rivers in the state of New Jersey. The supreme court in that cause determined that the grant of the lands in New Jersey to the lords proprietors, though the terms were broad and comprehensive, did not convey to the lords proprietors the soils or rights to fishery in the rivers in that state; that the right to fishery was a public right, not impaired by the grant; and that the people of the state acquired at the Revolution the sovereignty to the navigable water courses which remained in it only in so far as surrendered in the constitution of the United States. What that right is was declared in the case of Smith v. Maryland, 18 How. 71, 15 L. Ed. 269. In that case the supreme court say:

"Whatever soil below low-water mark is the subject of exclusive propriety and ownership belongs to the state on whose proprietary border and within whose territory it lies, subject to any lawful grants of that soil by the state, or the sovereign power which governed it before the Declaration of Independence. But this soil is held by the state, not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common liberty of taking fish,—as well shell fish as floating fish. The state holds the propriety of this soil for the conservation of the public rights of fishery thereon, and may regulate the modes of that enjoyment so as to prevent the destruction of that fishery. In other words, it may forbid all such acts as would render the public right less valuable or destroy it altogether. This power results from the ownership of the soil, from the legislative jurisdiction of the state over it, and from its duty to preserve unimpaired those public uses for which the soil is held."

The court in their opinion are careful to reserve their opinion upon the extent of the powers of the federal government, and of the rights of citizens of other states in the participation in this common right. These cases arose in states that were original parties to the federal constitution. The question as to the authority of the states that have since been formed of the public domain of the United States, and in which they were the proprietors of the lands and the soils of the navigable waters, was agitated in Alabama previously to the decision in Martin v. Waddell, above cited, and was decided upon in a number of cases which originated in the city of Mobile before 1839. These cases were cited in the argument and are reported. Mayor, etc., v. Eslava, 9 Port. 578, 33 Am. Dec. 325; Pollord's Heirs v. Files, 3 Ala. 47; Kemp v. Thorp, 3 Ala. 291; Abbot's Ex'r v. Kennedy, 5 Ala. 393; and other cases. These opin-

ions claim for the state of Alabama that the soils under the rivers within the state are not subject to sale by the United States as "waste and unappropriated land"; that whatever right of property exists remains in the state of Alabama. "What is said by the court of a property in the shore passing to the state upon its admission to the Union cannot, when fairly interpreted, be understood to mean the absolute ownership, but merely the right of jurisdiction and control, subject to the paramount right which is repeatedly conceded, and which the United States may protect." Kemp v. Thorp, 3 Ala. 291. This claim for Alabama was presented to the supreme court in a series of cases, upon the right of the city of Mobile to the land between "high-water mark and the channel of the river," under the first section of an act of congress "granting certain lots of ground to the corporation of Mobile and to certain individuals of the city," approved May 26, 1824. The cases of Mayor, etc., v. Eslava, Same v. Hallett, and Same v. Emanuel severally presented the question, but the supreme court preferred to sustain the validity of the defendant's title under the same act. Mayor, etc., v. Eslava, 16 Pet. 234, 10 L. Ed. 948; Same v. Hallett, 16 Pet. 264, 10 L. Ed. 958; Same v. Emanuel, 1 How. 95, 11 L. Ed. 60. The question was again presented in the case of Pollord's Lessee v. Hagan, 3 How. 212, 11 L. Ed. 565. The facts of the case were that in the year 1836 an act of congress (6 Stat. 680) was passed granting to the lessor of the plaintiff a parcel of land which was covered by the waters of the river between 1819 and 1823. The defendants claimed under a Spanish grant to Panton Leslie & Co., which was bounded by and extended into the river at its date. The circuit court of the state charged the jury "that, if they believed the premises sued for were below the usual high-water mark at the time Alabama was admitted to the Union, then the act of congress and the patent in pursuance thereof could give the plaintiffs no title, whether the waters had receded by the labor of man only, or by alluvion." The supreme courts of the state and of the United States approved the judgment for the defendant upon this charge. The supreme court of the United States in their opinion say:

"This right of eminent domain over the shores and the soils under the navigable waters, for all municipal purposes, belongs to the states within their respective territorial jurisdictions, and they, and they only, have the right to exercise it. To give to the United States the right to transfer to a citizen the title to the shores and soils under the navigable waters would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers. But in the hands of the states this power never can be used so as to affect the exercise of any material right of eminent domain or jurisdiction with which the United States have been invested by the constitution of the United States. For, although the territorial limits of Alabama have extended all her sovereign powers into the sea, it is there, as on the shore, municipal power, subject to the constitution of the United States and the laws made in pursuance thereof."

I have quoted from these various authorities to ascertain, as far as practicable, the exact question determined. They do not determine the limits of the state-authority over the shores or soils of

navigable waters, but simply determine that they are not subject to be appropriated by the grant of the United States to individual ownership. They raise a very strong doubt whether they can be appropriated, except under great qualifications, by the states. The case of Smith v. Maryland, 18 How. 71, 15 L. Ed. 269, implies this. Nor do we derive from these decisions any assistance in determining upon the riparian rights of the owners of the shores or to the water's edge. The authority of the states to municipal jurisdiction, and to the exercise of their police power over navigable waters, has not been deemed inconsistent with a right of the owners of the bank to erect wharves which shall be in aid of commerce, and which do not impede the public navigation. In all of the New England states, from an early period, this right to improve in front of the shore by the erection of wharves has been conceded. In some of those states this right had its origin in colonial ordinances; in others, in local usage arising out of public convenience or necessity. In East Haven v. Hemmingway, 7 Conn. 186, Chief Justice Hosmer states the general rule:

> "The right of individuals to use the soil of the shore subject to the paramount rights of the public, so far as my information extends, has never until now been disputed. The exercise of it in all of our towns bounded on navigable waters, and the enjoyment of estates under it, is known to every one. On the death of the landowner, to high-water mark, his estate in the shore, and the erections upon it, has descended to his heirs; and thus estates have been uniformly settled. On the part of the public no objection has been made. The interest of navigation has been subserved, and the consequences have altogether been salutary."

The discussion is nearly exhausted in this brief citation from the opinion of a court of the highest respectability. The right of a riparian proprietor to erect a wharf in front of his lands, and to maintain suits for its possession, has been admitted in the same court in Nichols v. Lewis, 15 Conn. 137, and in Simons v. French, 25 Conn. 346. A similar course of decision will be found in the courts of New Jersey. The case of Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997, before cited, established the claim of the state to control the soils and regulate the public rights to fishery. The claim of the lords proprietors was finally overturned in that decision, after being sustained in the circuit court of the United States. Immediately the inquiry was made whether the usage which the learned counsel who sustained the right of New Jersey before the supreme court referred to, as existing for the riparian owners to erect wharves, could be sustained against the prerogative of the state. This inquiry has been solved, after learned discussions in the cases of Gough v. Bell, reported in 22 N. J. Law, 441, and 23 N. J. Law, 624, in favor of the riparian owners. Similar discussions have arisen in Pennsylvania, Maryland, and North Carolina, with a similar result; also in California. The supreme court of the United States, in the case of Dutton v. Strong, 1 Black, 23, 17 L. Ed. 29, have adverted to the general prevalence of this custom on the Atlantic Coast, and have testified to its reasonableness, its salutary influence in the improvement of the country, its harmony with public and private right, and have adopted the rule as appropriate and applicable to the inclosed

seas which form so important a portion of the channels of intercom-
munication upon the northern border of the United States; and the
local courts in the northwest have enforced the same rule as entirely
compatible with the freedom of the navigable waters which formed
a portion of the first constitution for the administration and govern-
ment of what in 1787 was a wilderness, and which in 80 years has
become an empire. Nor do I find anything in the jurisprudence
or legislation of the state of Alabama to contradict these authorities.
In several of the cases cited to me the supreme court advert to the
facts that reclamations from the sea is a common practice, and they
assign to the riparian owner the same benefits from his improve-
ments as the law assigns to him from the accretions by alluvion.
In one of the cases a suit was brought for one of the wharves of this
city. In no portion of that case does it appear that the suit excited
any surprise, or that the question of a right to make wharves was
regarded as an open one. The fact appears on the record, and the
right to make the erection was not challenged. The only inquiry
was as to the title to the locus in quo under the riparian ownership.
Watkins v. Holman, 16 Pet. 25–54, 55, 10 L. Ed. 873; Abbot's
Ex'r v. Kennedy, 5 Ala. 393; Kennedy's Heirs v. Jones, 11 Ala. 63;
Dutton v. Strong, 1 Black, 23, 17 L. Ed. 29. The legislation of
the state and of the city discloses the same general facts of the rec-
ognition of these rights. The territorial government incorporated
the cities of Blakely and Mobile. Their corporate powers were en-
larged by the state. The care of the ports of the two cities at
first, and of the city of Mobile subsequently, seems always to have
commanded attention. Municipal officers were appointed with large
powers over the port, and to secure order among vessels. Wharves
are referred to as existing, and the removal of nuisances in and upon
them directed. The arrangement of vessels at the wharves, the man-
ner and materials of which they are to be composed and built, their
extent, and the limit to which they may go, have been regulated.
Powers have been given to the city to purchase them, and these
powers have been renewed in a late charter. These wharves have,
in some degree, been the result of necessity. The city has taxed
the riparian property, has imposed charges upon it so as to make
improvements indispensable to profitable ownership. The commerce
of the port has been large, and consisted in bulky articles, which
could only be landed upon artificial erections like these. It is a
notorious fact that in all the transactions of civil, commercial, and
social life, they have been regarded as property. They have been
bought and sold, mortgaged, and conveyed under decrees of fore-
closure of mortgage. They have been devised by last will and
testament, have answered all public charges, and have borne a full
share of revenue assessments, whether state, county, or of municipal
corporations. The constitution of the state of Alabama contains
all the provisions that have been found necessary to secure life,
liberty, or property from arbitrary seizure or hasty or unregulated
legislation. Therefore it could not be but what the proceedings of
the corporate authorities to strip the owners of property such as this
of its profitable enjoyment and value should have provoked opposi-

tion and controversy.   It was an unusual mode of disposing of rights which had so substantial a foundation in law and long possession.

I have stated what I deem to be the law as found in American jurisprudence.   That jurisprudence has, in a measure, modified that received from Great Britain; but it is apparent that there has been, and is now going on, a change on the same subject in Great Britain. In the Jure Maris, imputed to Lord Hale, it is said:

"It is admitted that de jure communi between the high water and low water mark doth prima facie belong to the king. Although it is true that such shore may, and commonly is, parcel of the manor adjacent, and so may be belonging to a subject, as shall be shown, yet it is prima facie the king's. Harg. Law Tracts, p. 13. Although the king hath prima facie this right in the arms and creeks of the sea, communi jure, and in common presumption, yet a subject may have such a right (1) by the king's charter or grant; and this without question. The king may grant fishing within a creek of the sea, or in some known precinct that hath known bounds, though within the main sea. He may also grant that very interest itself, viz. a navigable river that is an arm of the sea, and soil thereof."

These latter declarations of the extent of the title of the king are most seriously questioned, and the weight of the authority on the subject is entirely opposed to them.   The supreme court of the United States, in the case of Martin v. Waddell, 16 Pet. 369, 10 L. Ed. 997, declare that the king has no power to impair the right of the public to take fish as settled by the later English authorities. Schuttes, in his work on Aquatic Rights (page 111), says "that it must be understood that soils under navigable waters are not susceptible of transfer till they become convertible and derelict"; and Woolnitz, in his work on Water Courses, states the same doctrine (page 25).   Phear, in a late treatise on the same subject, says "that the ownership of the crown over the sea and its shore is of a very qualified character, and limited entirely by the interests of the public, and consequently all exclusive privileges are void, as having been made ultra vires, unless calculated on the whole to be advantageous to the public exercise of that right which they seem to violate." And in another place he says:

"In the possession of the land covered by tidal or navigable waters it would seem the crown simply represents the public. The crown is in fact the subjects' trustee for the purpose of securing to them collectively all the advantages and privileges which can accrue from such property." Phear, Water, 44, 67.

In the Jure Maris (page 85), in speaking of nuisances, reference is made to the damage to a port by buildings extending too far into the water where ships or vessels might have ridden.   The author proceeds:

"That nuisance, or not nuisance, is a question of fact. It is not, therefore, every building below the high-water mark, nor every building below the low-water mark is, ipso facto, a nuisance. For that would destroy all the keys that are in all the ports in England. For they are all built below the high-water mark, for, otherwise, vessels would not come to them to unlade; and some are built below low-water mark. And it would be impossible for the king to license the building of a new wharf or key, whereof there may be a thousand of instances, if ipso facto it were a nuisance, because it straitens the port; for the king cannot license a common nuisance. Nay, in many cases, it is an advantage to a port to keep in the sea water from

110 F.—12

diffusing at large, and the water may flow in shallows where it is impossible for vessels to ride."

This is the law as applied in the courts of the United States. The author of the Jure Maris proceeds to say, where the soil is the king's, the building below high-water mark is an encroachment upon the king's soil, which he may demolish or seize or arent at his pleasure. It is upon this question that controversy now exists in Great Britain, and which controversy has been avoided in this country by the adoption of a principle which secures improvements on the banks of navigable rivers from the owner of the bank, who is most interested in making them, and by requiring—what seems to be the tendency of opinion in Great Britain—that this proprietor shall not do anything which can be deemed a nuisance instead of a benefit. Rex v. Russell, 6 Barn. & C. 566; Chad v. Tilsed, 2 Brod. & B. 403; Rex v. Ward, 4 Adol. & E. 384; Reg. v. Betts, 16 Q. B. 1022. The remarks of Mr. Justice McLean in Bowman v. Wathen, 2 McLean, 376, Fed. Cas. No. 1,740, accord with the general sentiment of the country, and with that local usage which determines right and finally ripens into law. He says:

"We apprehend that the common-law doctrine as to the navigableness of streams can have no application in this country, and that, the navigableness does in no respect depend upon the ebb and flow of the tide. On navigable streams the riparian right, we suppose, cannot extend generally below high-water mark. For certain purposes, such as the erection of wharves and other structures for the convenience of commerce, and which do not obstruct the navigation of the river, it may be exercised beyond this limit."

Nor is it surprising that there should be a change or modification in the laws relating to the use of water courses, according to the mutation in the wants, conditions, and ideas of different ages. The vast dominion of the Roman empire required that all the great channels of intercommunication should be free, and hence in the laws of the Romans the sea and its shores were declared to be among the things common to all men. But in the Roman law the right or usage of the riparian proprietor was respected, and interdicts were granted by the Roman prætor against those who infringed navigation or disturbed the enjoyments of the riparian proprietors alike. During the middle ages and during the empire of the feudal system— a system narrow, restrictive, unsocial, and warlike—rivers became private property, and were burdened with charges that would now be intolerable. In the Jure Maris, among interests of the king is mentioned "an interest of possession or recreation." The author says:

"Before Magna Charta it was frequent for the king to put as well fresh as salt waters in defense for his recreation: that is, to bar fishing or fowling in a river till the king had taken his pleasure or advantage of the writ de defensione riparie, which anciently was directed to the sheriff to prohibit riviation in any rivers in his bailiwick." Harg. Law Tracts, p. 7.

In many of the countries of Europe large sections of its most important rivers were granted eo nomine to private owners. These were granted for the benefit of the rights of fishery and for the tolls of navigation. The constant struggle since Magna Charta has been to remove these impediments and to secure the public rights of navi-

gation and fishery, and along with this struggle has been the concession to riparian proprietors of all those rights which can be exercised in harmony with them. The right to alluvion, as established in the civil law, and which prevails by custom, as decided in Rex v. Yarborough, 2 Bligh (N. R.) 147, the right to the use of the water in its flow through the land of the proprietor, the right to embank and to reclaim low and marshy lands, and the right to make structures in ports and harbors in aid of commerce, are instances of the enlarged policy of modern times. Lorman v. Benson, 8 Mich. 18, 77 Am. Dec. 435; Rice v. Ruddiman, 10 Mich. 125; Mayor, etc., of New Orleans v. U. S., 10 Pet. 717, 9 L. Ed. 573; Banks v. Ogden, 2 Wall. 58, 17 L. Ed. 818; Attorney General v. Chamcers, 27 Eng. Law & Eq. 242.

The plaintiffs in this suit, and the defendants who have been made parties as having a common right and interest, and who could not be made parties under the constitution of the court in any other mode, claim title under the United States to the bank of the river Mobile. By the act of congress of the 25th of April, 1812, entitled "An act for ascertaining the titles and claims to lands in that part of Louisiana east of the River Mississippi and Island of New Orleans," being the territory south of the Mississippi territory, and between the Iberville and the Perdido rivers, including Mobile, a commissioner was appointed to examine all the titles derived from the French, British, and Spanish governments, the former sovereigns and possessors of that country, to any lands within it. The commissioner was required to classify the claims, and to report abstracts of the title and his opinion upon them. His reports were made to the secretary of the treasury, and were submitted to congress by that officer. These reports were acted on by congress, and laws were passed, that are referred to in the bill, in 1819 and 1822. Congress recognized complete grants as valid; incomplete titles were confirmed as if they had been completed, when they were sustained by written evidence of title; and settlers were allowed a limited quantity as a donation to include their settlements. The whole line of the river Mobile within the city is held under these titles, except that small portion that was embraced in the sale of the Ft. Charlotte lots. The most important of these titles have been the subject of adjudication in the courts of Alabama and the supreme court of the United States since these recognized and confirmatory acts were made. In Kennedy's Ex'rs v. Hunt's Lessee, 7 How. 586, 12 L. Ed. 829, the supreme court of the United States say of the Orange Grove title of John Forbes & Co.:

"That the grant made by the intendant, General Morales, in 1807, was in itself, unaided by the sanction of congress, a valid title, we do not assert; but being reported on by the commissioner as a title complete in form, according to the usages and laws of Spain, and sanctioned by congress as a perfect title by the act of 1819 (3 Stat. 528), the courts of justice are concluded by the action of the political department, and bound to pronounce the grant to Forbes & Co. a perfect title in substance as well as in form, because the claim was within the exclusive jurisdiction of the political department in 1819, when congress acted on it."

The extent and limit of this title have been several times declared by the supreme court of Alabama as reaching to the channel

of the river, and as unaffected by any state right to the shore. Hagan v. Campbell, 8 Port. 9, 33 Am. Dec. 267; Hallett v. Hunt, 7 Ala. 882; Magee v. Hallett, 22 Ala. 700; Mayor, etc., v. Emanuel, 9 Port. 403. This grant embraces the shore of the river Mobile, in so far as granted by the act of the legislature of January 31, 1867, within the northern and southern boundaries of the grant. In all the controversies that arose upon the act of the 26th of May, 1824, before referred to, the title of the riparian proprietors under that act was sustained, in the supreme court, to the channel of the river. Mayor, etc., v. Eslava, 16 Pet. 234, 10 L. Ed. 948; Same v. Hallett, 16 Pet. 261, 10 L. Ed. 958; Same v. Emanuel, 1 How. 95, 11 L. Ed. 60.

It is to be noticed that Mobile is a port under the laws of the United States, and that, besides the proprietary rights of the United States in all the public domain of the state, they have a power over navigation and commerce under the constitution of the United States that renders the act of May 26th, before mentioned, an act of importance in this connection. These acts of congress affect all the city front above Church street. Besides this claim of title to the locus in quo, the general right before mentioned as belonging to a riparian proprietor is co-extensive with the limits of the city. This general right is sustained by possession, user, enjoyment, recognition in state and municipal legislation, and by general acquiescence. It is under these conditions that the invasion of this right was made, and the injunction applied for. In the case of Attorney General v. Sheffield Gas Co., 17 Jur. 677, Lord Justice Bruce said:

"It seems to me right to notice the incorporation, whether completely or incompletely, of the defendants, and the quality of the persons thus associated together. They have the advantage and strength of lastingness, union, and number; and it may well be thought, nor is it new to hold and act upon the opinion, that infringements of rights in respect to lands by persons and bodies so circumstanced require especially to be watched with a careful eye and repressed with a strong hand by a court of equity when it can exercise jurisdiction."

In the case of Dun River Nav. Co. v. North Midland Ry. Co., 1 Eng. Ry. Cas. 135, Lord Cattenham said:

"I am not at liberty, even if I were in the least indisposed, which I am not, to withhold the jurisdiction of this court as exercised in the first case in which it was exercised,—that of Agar v. Canal Co., Coop. t. Eld. 77,— when Lord Eldon said simply on this that he exercised the power of this court for the purpose of keeping those companies within the powers which the acts gave them; and most wholesome exercise of jurisdiction it is, because, great as the powers necessarily are to enable the companies to carry into effect the works of this magnitude, it would be most prejudicial to the interests of all persons with whose property they interfere if there was not a jurisdiction continually open and ready to exercise its powers for the purpose of keeping them within that limit which the legislature has thought proper to prescribe for the exercise of the power."

In the motion before me the plaintiffs complain that the defendants, the corporation of Mobile, propose to invade rights of property derived from titles sanctioned by the government of the United States in the fulfillment of their obligations under the law of nations and in the exercise of their function to dispose of the public domain;

that these rights are sanctioned by all those acts which afford security to titles and are evidence of their validity. The pretext for the invasion of this property is a legislative grant passed without notice to the parties, and the contents of which would hardly have afforded notice, to an unprofessional mind. It is to be considered, too, in this connection, that the situation of the state of Alabama, in so far as its government is concerned, is anomalous. The effect of the invasion complained of is to disturb a long possession, to withdraw from the owners their income, and to place them in antagonistic relations with their tenants and persons landing goods on the wharves. The ordinance leads at once to everlasting and vexatious controversies and to a vast multiplicity of suits. The controversy must embarrass commerce and produce private inconvenience and distress. The court is not able to accede to the conclusion that the right to take wharfage rests upon the same foundation as the right to erect toll bridges and to establish ferries over navigable waters. The fact is notoriously otherwise. Wharves exist in every port, city, and landing place in the country, and wharfage is collected independently of any regulating act from legislative or municipal authority. The authorities in Great Britain and the United States show there is a wide difference. In Colton v. Smith, Cowp. 47, Lord Mansfield says in reference to a claim for wharfage:

"In this case everybody that pays has a benefit, for if they go to the wharf they have the benefit of it, and if they land their goods elsewhere within the manor they land upon the plaintiffs' private property."

The right to claim wharfage as an incident to a right of property is stated in the Jure Maris (page 77); and in the Wharf Case, 3 Bland, 361, the distinction is drawn between tolls across a navigable stream and tolls for the use of property on the land. I cannot doubt that, under the principles of a vast number of cases cited to me, the court has authority to grant an injunction. The cases of Griffing v. Gibb, 2 Black, 519, 17 L. Ed. 353, and Parker v. Manufacturing Co., 2 Black, 546, support the conclusions of the court. For the reasons above stated, an injunction is allowed according to the prayer of the bill.

(May 18, 1868.)

This cause has been submitted for a final decree upon the bill, exhibits, answer, and proceedings in the suit, and the argument of counsel before the court. Upon a motion for a preliminary injunction the court had occasion to examine the title of the plaintiff as disclosed in the bill. In that examination it was ascertained that the river front of the river Mobile, on its west bank, within the corporate limits of the city, had been conveyed by the French, British, or Spanish governments by titles that had been recognized as valid by the United States, or had been confirmed as if complete, or had been conveyed by the United States under sales provided for by acts of congress; that under these titles the marshy lands had been filled up and reclaimed, the area of the city enlarged, its sanitary condition improved, and its commercial importance and prosperity promoted, without any impediment to the public rights

of navigation in the river. These improvements, including the wharves and quays, have been enjoyed as property, and have been purchased and sold, incumbered and charged, and have passed by descent and devise as property, during the whole period of the existence of Alabama as a territory or state, with unhesitating confidence, and that no act of the state or of the corporation until 1867 was calculated to impair that confidence. The first act of this kind was passed the 31st January, 1867, and is in these words:

"An act granting to the city of Mobile the riparian rights in the river front.
"Section 1. Be it enacted by the senate and house of representatives of the state of Alabama in general assembly convened: That the shore and the soil under Mobile river, situated within the boundary lines of the city of Mobile, as defined in section two of an act to incorporate the city of Mobile, approved February the 2nd, eighteen hundred and sixty-six, be and the same is hereby granted and delivered to the city of Mobile.
"Sec. 2. Be it further enacted, that the mayor, aldermen and common council of the city of Mobile, be and are hereby created and declared trustees to hold, possess, direct, control and manage the shore and soil herein granted in such manner, as they may deem best for the public good. Approved January 31st, 1867." Acts 1866-67, p. 307.

The body calling itself the "General Assembly," that disposed of "the shore and soil under Mobile river" within the limits of its principal commercial city, was chosen under a constitution which has not been recognized as legal by the legislative power of the Union. On the contrary, on the 2d March, 1867 (14 Stat. 428), an act of congress declared "that no legal state government exists" in a number of the states, including Alabama, and "that adequate protection for life and property" did not exist in them. If the object of the act of the so-called general assembly was to deprive the owners of this property of their title, or to impede their beneficial use and enjoyment of it, it must be regarded as an anomaly in legislation, which may, however, be accounted for by the disturbed and disordered condition of the public political affairs. No such legislation is to be found in the period when tranquillity was undisturbed in Alabama, or constitutional government existed. The corporate authorities in Mobile on the 15th March, 1867, formally accepted the act, "with all the authority, benefits, rights, privileges, and immunities" it conferred. On the same day they adopted a resolution by which the mayor and the president of the boards were authorized "to pursue such a course" and "to adopt such measures as in their judgment will be necessary and proper to protect the rights and interests of this city in and to the benefits conferred or intended to be conferred" by the act. The first measure brought to the notice of the court bears date the 4th April, 1867. This consists in the draft of an ordinance which recites the act and declares that the "city deems it best for the public good that the wharves of said city should be free to commerce without charge except such dockage as may be necessary to keep the same in a proper repair," and ordains "that hereafter it shall not be lawful to charge or collect any toll, wharfage or dockage for the use of the shores or wharves within said city except such sums as shall hereafter be allowed or prescribed by the mayor, aldermen and common council of said

city; provided that this ordinance shall not apply to such wharves as are now under lease from said city to individuals during the existence of their leases." The adoption of this ordinance was recommended by the city attorney and four gentlemen of the bar who have represented the city during the whole progress of this suit. It was adopted with but one dissenting voice by the board of aldermen. The answer states that it was not passed in the council. But on the 7th of May a draft of another ordinance, containing similar recitals, and charging that the owners of this property "have obtained and hold possession of the same, without warrant of law, and much to the injury of the prosperity of the city," and "that the public should be notified that the said burdens on commerce [wharfage, dockage, etc.] are unlawful, and that said wharves shall be treated as public highways, free from charges, except such as may be necessary to keep the same in proper condition and management for the good of the public," was submitted to the council by its president. This plan of an ordinance contained the following provision:

"That it is not and shall not be lawful for any person to demand, levy, charge or receive wharfage, toll or charge of whatever kind for the use of any wharf, or wharves in the city, but said wharves shall be free for the use of commerce without any exaction for the use of the same save such charges as may hereafter be provided for by the ordinances of the city, for the proper preservation and repairs of said wharves."

The council ordered this to be published, and action was postponed for one week. In this interval, or before action upon it, the plaintiffs filed their bill. The opinion of this court was that these proceedings involved a serious invasion of rights of property, tended to array against those rights popular clamor and prejudice, and threatened to produce multiplicity of suits, irritating litigation, depression of the value of rights that had been enjoyed and were vested, and irreparable mischief. It was not necessary, in the opinion of the court, that the ordinances should be adopted, to entitle the parties to the remedial and preventive jurisdiction of the court. It was apparent that the mischief would be produced by declarations of this kind under the advice of responsible counsel, and by bodies having a large authority and potent influence over the public mind. In the conditions of public order then existing such declarations were calculated to produce acts dangerous to the public peace. The proceedings in the boards of council and aldermen were obviously directed to place the owners of this property in antagonism with all other members of the community. The public were to be notified, and were notified, that the possession and enjoyment of wharf property had imposed an onerous burden upon the city, and that it was a lawless usurpation which each individual might resist, and in resisting which the corporation was prepared to uphold and support him under the act of January, 1867. In the case of Bonaparte v. Railroad Co., 1 Baldw. 205, Fed. Cas. No. 1,617, Mr. Justice Baldwin says:

"To entitle a party to this remedy [injunction] it is not necessary that there be any threat or declared intention to commit the act which will

cause the injury. It is enough that preparatory acts are done from which the inference is made of the defendant's intentions, as, if he employs a surveyor who marks trees, it is presumed to be done with the intention to cut them down; so, if he insists upon his right to do the act, or makes claim to land not his own; but the complainant's mere apprehension or belief is not enough, unless such facts appear as show them to be well founded, so as to satisfy the court that the ax is laid at the foot of the tree, and that the act will be done without their interference. Whenever that is done the injunction goes."

According to the plans submitted to the boards, there is a positive assertion of right on their part to control wharves and wharfage, a positive denial of the title of the plaintiffs, and an invitation to the public to use the property without making any compensation to the owners. These plans were sanctioned by an unusual array of professional counsel, and claimed to be valid under an alleged act of the legislature of Alabama. This cause has been pending in this court for nearly one year, and the answer of the defendant was only filed a month ago. During this first-named period the corporate authorities have been restrained by injunction. The answer acknowledged the acceptance of the act of January, 1867, and does not dispute the accuracy of the exhibits that expose the conduct complained of in the bill, but insists that these measures are not to be regarded as acts of the corporation, because they were not adopted. The answer says:

"Respondents do not know whether the action of the boards of aldermen and common council has had any, or, if so, what, effect upon complainants' title, if they have any, on the value or availability of their property, nor what opinions the public entertained on the subject of complainants' right to collect wharfage. No official acts have been done by respondents in the premises, except to accept the grant of the state, to take the opinion of counsel on their rights, and to employ such counsel to maintain the city's rights. Respondents again deny that they ever passed upon the question of the rights of the complainants to the wharf structure, and to keep up and use the wharves for themselves and the public, so long as the state and general government tolerated them as projections into the sea beneficial to commerce. Respondents insist that their rights are subject to the right of the state to regulate the wharfage to be charged to the public; that the state has empowered the city of Mobile to regulate these charges; that it proposed to discharge this duty to the public; and, further than this, respondents have, under advice of counsel, forborne to interfere in any manner with the wharves or the owners."

The court, in reviewing the exhibits to the bill which disclose the purpose of the corporate authorities, as guided by the advice of counsel, is not able to give them the interpretation which is contained in the answer. When the right was asserted to declare the wharves to be free and open to all, and that no wharfage could be collected until the corporate authorities should permit it, and that none should be collected except such as was necessary for their maintenance and repair, it seems to the court that there was a proposed interference with the wharves and their owners, and that this "legislation" was prompted by advice of counsel. The court does not concur in the conclusion that these rights of the owners are subject to what is termed the legislative powers of the corporation of Mobile. It is by no means clear that even the general assembly, so called, contemplated any such result. The grant by that body is of the shore and soil

under Mobile river, but much of the shore had already been appropriated specifically by a grant of the Spanish government recognized as valid in 1819 by congress, and by the act of 26th of May, 1824, referred to in the bill and answer. The probability is that the object of the grant was to enable the city to deepen the channel of the river, and to make improvements that would bring to the wharves larger vessels. The port of Mobile was established by acts of congress. In ports legally established, Lord Hale, in his work, Deportibus Maris, says:

"If A. has the ripa or bank of the port, the king may not grant a liberty to unlade upon the bank or ripa without his consent, unless custom has made the liberty thereof free to all as in many places it is; for that would be a prejudice to the private interest of A., which may not be taken from him without such consent, and therefore it hath been the course to secure the interest of the shore beforehand for the building of wharfs and keys for the application of merchandise and for the building of houses of receipt." Harg. Law Tracts, 73, 74.

Again he says:

"Though it is true it is rare to find any port, but that the king, or the owner of the port in point of franchise, hath such a convenient portion of the shore and land adjacent, where wharfs and keys and warehouses may be built for the lading and unlading and safeguard of merchandises, yet the interests are and may be divided. However, they are several in their nature, and the duties that arise by reason of the goods when unladen and laid on the shore, or in relation thereto, are different from those that have been before spoken of. And many times it falls out that such a place within a port may be of great conveniency to make a common key or wharf, where the property of the soil may belong to a subject, whereby either his interest must be bought in by the lord of the port, or he must have those benefits that may arise by the taking or landing of merchandise."

Again he says:

"A man for his own private advantage may in a port town set up a wharf or crane, and may take what rates he and his customers can agree for cranage, wharfage, houpelage, pesage; for he doth no more than is lawful for any man to do, viz. makes the most of his own." Harg. Law Tracts, 76, 77.

It is true that a toll cannot be levied for passage along or across an arm of the sea or a navigable river, for the right to navigate is a common and public right. But when a riparian owner erects a landing place upon his land, and affords facilities for lading and unlading of goods, and these facilities are used, he is entitled to compensation. He grants a quid pro quo,—a valuable consideration for the benefit he receives, in allowing a use of his property and in maintaining the structures for use. He infringes no common right, nor does he seek to appropriate what is common for his individual use. He merely employs his property in a particular way, and, in taking compensation, only makes what he can from what is his own. 1 Crabb, Real Prop. § 109. Nor can there be any reasonable objection to the allowance of such a right to the riparian proprietors. They do not contract or impair any of those rights of navigation that have been preserved by constitutional and legal enactments. It is admitted in this case that what they have done has resulted favorably to the commerce of the port and the health of the city. On the river

above and below these improvements there are pestilential marshes, and the islands in front of them are magazines of malaria which not unfrequently exert a baneful influence on the city itself. The enterprise and capital employed by the claimants in this cause, and those from whom their title has been derived, have contributed not a little to the prosperity of Mobile. These improvements have been made and enjoyed as property for a period exceeding the longest prescription. The people of the state have assented to them and have benefited by them. Elsewhere such improvements have been regarded with favor. By the act of congress of May, 1824, the privilege was conceded, and in the judicial proceedings of the state the right has been acknowledged. The claim on the part of the city amounts to this: That private property may be taken for the public use without compensation to the owners, or, as the claim is modified by the answer, with only such compensation as the corporation may think proper to allow. Such a principle is not admissible, and it is a significant fact in this connection that in the fourteenth amendment to the constitution of the United States, which is now pending for adoption or rejection before the state legislatures, there is a clause restraining the power of the states over private property. The adoption of that amendment will place rights of property under the guaranty of the constitution of the United States, and under the protection of the general government.

In the opinion of the court, the plaintiffs, and defendants in a similar condition, have a title to the relief prayed for. I shall direct a reference to the master to ascertain the titles granted, confirmed, or recognized by the United States to the river front within the corporate limits of this city, and embraced in this controversy, to cause a map to be made showing the situation of the wharves, with the names of those who are in possession, claiming title thereto, and are parties to this suit, that the application of this decree may be defined and understood. I shall continue the injunction, and upon the coming in and confirmation of the report the same will be made perpetual. The costs of the suit must be paid by the corporation of the city.